**HICKEY etc., Appellant, v BURKE and CITY OF CLEVELAND, Appellees.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 20,367.    Decided June 19, 1946.

Hildebrant, P. J., Matthews & Ross, J. J., of First District, sitting by designation in the Eighth District.

George J. McMonogle, Cleveland, and Richard E. McMonogle, Cleveland, for appellant.

Lee C. Howell, Cleveland, and Robert J. Selzer, Cleveland, for appellees.

## OPINION

By MATTHEWS, J.

This is an appeal on questions of law only from a judgment denying the prayer of the plaintiff-taxpayer for an injunction restraining the City of Cleveland and its Mayor from entering into a certain relation with the State of Ohio, involving the title, maintenance, and operation, as a receiving hospital for mentally ill, of Hoover Pavilion, which had been constructed and was owned and operated with funds derived by taxation by the City of Cleveland primarily as a psychopathic unit of its municipal hospital but a minor part of which at the time was being used as a hospital for tubercular patients. A part of the bonds issued to secure funds for the construction of Hoover Pavilion have not matured and constitute a general obligation of the City of Cleveland, to pay which it must exercise its taxing power.

By §1890-16 GC, effective October 11th, 1945 (119 Ohio Laws, 616; 121 Ohio Laws————S 48) it was enacted:

"Under the direction and with the authority of the director, the division of mental hygiene shall develop, extend and complete a statewide system of receiving hospital service, by contracting for the use of services for the care and treat-

ment of patients, or by establishing receiving hospitals or by leasing, or contracting for the use of privately or publicly owned facilities to be designated as receiving hospitals as defined and provided for herein, either separate from or in connection with existing or future state hospitals, which receiving hospitals shall be used for the observation, care and treatment of the mentally ill, and especially for those whose condition is incipient, mild, or of possible short duration. Such receiving hospital shall perform any of the work or duties authorized to or required of the division of mental hygiene."

As a part of the implementation of the policy expressed in §1890-16 et seq., GC, the General Assembly provided for the expenditure of $726,000.00 for a receiving hospital for the mentally ill of Cuyahoga County, in which the City of Cleveland is situate.

On February 25th, 1946, the Council of the City of Cleveland by unanimous vote, passed an ordinance which was duly signed by the Mayor on February 28th, 1946, in the preamble of which was recited the appropriation of $726,000.00 by the General Assembly, the fact that the City of Cleveland owned and operated Hoover Pavilion as a receiving hospital for the mentally ill, that it was the desire of the City of Cleveland to make available at once to the State of Ohio the facilities of Hoover Pavilion as a receiving hospital for the mentally ill and in addition to provide facilities for its necessary and desirable expansion as a receiving hospital; and it also recited its conclusion that it had the legal power to make the transfer without complying with §§3631, 3698 and 3699 GC. Then reciting that it was acting pursuant to the authority of the case of **Green v Thomas, 37 Oh Ap 489**, it was determined that by reason of the urgency and need of care for the mentally ill and the benefit flowing to the City of Cleveland by reason of the establishment, maintenance, and operation of a receiving hospital for the mentally ill by the State of Ohio in and upon the premises of the City of Cleveland upon which are located the City Hospital facilities, it is in the public interest to transfer the title to the site upon which the Hoover Pavilion is located, together with such additional land owned by the City as is necessary properly to operate a receiving hospital for the reception, treatment and care of the mentally ill, it was determined that sections 236 and 237 of the Municipal Code of Cleveland of 1924 and §§3698 and 3699 GC, (prescrib-

ing the method to be pursued by municipal corporations in making sales of municipal property), were not applicable and were waived and this was followed by an authorization of and direction to the Mayor to enter into an agreement with the State of Ohio for the transfer to the State of the real estate, personal property and facilities of Hoover Pavilion upon the following considerations:

"1. The sum of one dollar ($1.00).

2. The designation of such Hoover Pavilion by the state of Ohio as a receiving hospital for the reception, treatment and care of the mentally ill.

3. The maintenance, operation and development of said Hoover Pavilion as a receiving hospital for the reception, care and treatment of the mentally ill.

4. The expenditure by the state of Ohio of the sum of $726,000.00 appropriated by the 96th General Assembly of Ohio for capital expenditures for a receiving hospital in Cuyahoga County in the improvement of said Hoover Pavilion and its facilities including the ultimate purchase of approximately ten sublots on Aiken avenue in order to provide adequate space for entrance to said pavilion from said Aiken ave.

Said agreement shall be prepared by the director of law and shall provide for the furnishing of heat and such other services as the state may require in the operation of said Hoover Pavilion and in addition shall provide for such facilities and services as may be required by the state until such time as the state may operate said receiving hospital as an independent unit, and in addition such other matters pertinent to said transfer."

And that the deed of conveyance should contain a reverter clause to the effect that if the state should fail to maintain and operate the property conveyed as a reception hospital for the mentally ill, the premises together with all the improvements made or erected thereon should revert to, vest in, and become the absolute property of the grantor.

It was at this juncture that this action for an injunction to restrain action under the ordinance was instituted.

The validity of what is proposed by this ordinance is assailed on the ground that property of the value of $2,274,000.-00 will be transferred to the State of Ohio for the nominal consideration of $1.00, without advertising for bids, or op-

portunity for competitive bidding, without any finding that the property was no longer needed for any municipal purpose, without statutory authority, and in direct violation of the city charter and the statutes of the State already referred to.

In preparing to consider the problem presented, certain general principles should be kept in mind:—

(1) The State—that is, the people acting as a political entity—is the sovereign and has complete governmental power limited only by the Constitution of the United States.

(2) The people, through the state constitution, have conferred upon the General Assembly the legislative power of the state which embraces, inter alia, the power to legislate for the public health and that, therefore, it has the power to make provision by legislation for the mentally ill.

(3) Municipal corporations are mere political subdivisions or agencies of the state. The State is the principal and they are the agents, and while they derive their power of local self-government directly from the people through the Constitution (Art. XVIII, sec 3) such power is subordinate to the legislative power granted by the people to the General Assembly to safeguard the public health, safety and morals of the people by general laws applicable throughout the State. Leis v Railway Co., 101 Oh St 162, State, ex rel., v Zangerle, 103 Oh St 566. Therefore, the General Assembly may leave to the municipalities the task of conserving the health, morals or safety in a particular field, but as the policy making body for the whole state may conclude that the situation requires the enactment of general laws. When such laws are enacted all conflicting municipal regulations become inoperative. The existence of such municipal regulations in no way limits the power of the General Assembly to enact such general laws. In State, ex rel. Ellis, v Gamble, 138 Oh St., 220, it was held as stated in the third paragraph of the syllabus that:

"3 In matters of state-wide concern the state is supreme over its municipalities and may in the exercise of its sovereignty impose duties and responsibilities upon them as arms or agencies of the state."

Or after it has imposed duties upon a municipality, it may relieve the municipality of the duty and withdraw the

power. If property has been acquired, it may shift the title and control to other agencies or take title and control itself. In 37 Am. Jur., at 701 and 702, it is said:

"The legislature may take the control of such property from the officers of the corporation and turn it over to other officers under the more direct supervision and control of the state. The state may, at its pleasure, modify or withdraw the power to hold and manage property, or take such property without compensation, hold it itself or vest it in other agencies, conditionally or unconditionally, with or without the consent of the citizens, or against their protest; it may require the municipality to expend its funds for the acquisition and maintenance of such property; or it may provide whatever regulations for the use and management thereof it may deem to be for the public interest. The legislative power over municipal property, when it exists does not however, extend so far as to enable the legislature to require a transfer without compensation, to a private person or private corporation. The control which the legislature may exercise is limited; it must act by public agencies and for public uses exclusively. If the municipality has purchased property for purposes which are strictly and purely public, as a mere instrumentality of the state, such property is so far subject to the control of the legislature that other instrumentalities of the state may be substituted for its maangement and care; * * * "

(4) The state itself is not embraced within the general terms of a statute. If the state is to become bound the language must be clear that the General Assembly so intended. In a case involving the question of whether the state was bound to pay interest for delay in payment of money the Court said: in **Ohio, ex rel. v Board of Public Works, 36 Oh St 409, at pages 414 and 415:**

"It is also insisted by the defendants, that the claim of relators, being one against the state, interest thereon cannot be allowed.

On the other hand it is claimed that the relators are within the terms and meaning of the statute which provides 'That all creditors shall be entitled to receive interest on all money after the same shall become due either on bond, bill, promissory note, or other instrument of writing, or contract for money

or property.' That the words of this statute are broad enough to embrace the claim of relators is not disputed; but it is contended that the state is not embraced within the general words of a statute, and can be held to be within the purview of a statute only when so declared expressly or by necessary implication.

The doctrine seems to be, that a sovereign state, which can make and unmake laws, in prescribing general laws intends thereby to regulate the conduct of subjects only, and not its own conduct.

It is a familiar doctrine, that a state is not affected by the statute of limitations, however general its terms may be. **Greene Township v Campbell, 16 Oh St 11;** Josselyn v Stone, 28 Miss. 753. Upon the same principle, it has been held, that a statute providing that 'costs shall follow the event of every action or petition,' does not apply to a party prevailing against the state even in a civil cause. State v Kinne, 41 N. H. 238. Indeed the doctrine of the common law expressed in the maxim, 'The king is not bound by any statute, if he be not expressly named to be so bound' (Broom Leg. Max. 51), applies to states in this country as well. Morever, upon the same principle rests the well-settled doctrine that a state is not liable to be sued at the instance of a citizen."

(5) When specific property is needed by the state, it is not required to enter the competitive field and take its chance of being the highest bidder in the market place or at a public auction conducted as prescribed by statute. It has a right of pre-emption by agreement with the owner or a value fixed by a jury in an action to appropriate the property in the exercise of its right of eminent domain.

It was with these attributes of sovereignty that the General Assembly determined to assume through state officials more direct control over the operation, (and, if need be, the ownership) of the hospital for the mentally ill. It expressed its policy and the method of effectuating it in §1890-16 GC, effective October 11th, 1945, already quoted. By this statute, it authorized the director of public health to develop a state-wide system of receiving hospital service by contracting for the use of "publicly owned facilities." It thereby expressly authorized the director of public health to contract with cities for the use of municipally owned hospitals—and no distinction

was made between such hospitals as were obtained through expenditure of tax money and such as might be obtained in some other way.

To carry out its policy, the state decided that it needed Hoover Pavilion. From that decision there could be no appeal. If it had been owned by a private person it could have taken it against his will under its power of eminent domain. It happens, however, that Hoover Pavilion is owned and operated by an instrumentality of the state, through which it had performed its duty to care for the mentally ill before it decided to establish a state-wide system. In acquiring this facility for its state-wide system, the provisions for competitive bidding are entirely irrelevant, whether eminent domain is invoked or the power to contract is resorted to under §1890-16 GC. And it is not devoting Hoover Pavilion to a purpose different from the original purpose.

Viewing the relation between the state government and the City of Columbus and the agreement entered into, the Court in **Green v Thomas, 37 Oh Ap 489,** concluded that the transaction was not a sale or a gift of municipal property and that, therefore, the statutory and constitutional provisions applicable to sales or gifts of municipal property were inapplicable. We think the features of this transaction, whereby the state assumes the maintenance and operation of Hoover Pavilion as a receiving hospital for the mentally ill, more strikingly discloses the inapplicability of such provisions. It is a co-operative arrangement for the performance of a duty resting upon all the people.

Counsel urges that by Art. **VII,** sec **1** of the **Constitution** of Ohio, the obligation is imposed upon the state to provide for the insane, which is true, but the Constitution does not prescribe the instrumentalities by which the duty should be performed. It does not prohibit the State government from authorizing or requiring municipalities and political subdivisions to perform the duty, by providing for the mentally ill within their respective borders. Whether the duty is performed by state officials or by local officials, it is performance of this constitutional duty. The change in policy as evidenced by the recent legislation is that the State government has concluded to exercise a greater supervision and defray a greater share of the expense. And speaking of property acquired for governmental purposes, it is said in 1 McQuillan on Mun. Corp. (2d.) 681, that:

"It may be transferred to some other agency of government charged with the same duties, or it may be devoted to other public purposes. As to public property in the sense of its being governmental, the limit of legislative control is that such property cannot be devoted to private uses by legislative action alone, either directly or indirectly, after its dedication to public uses."

We think it appropriate to notice certain cases relied on by the plaintiff.

Wasson v Comm'rs, 49 Oh St 622, decided that a county could not levy a tax to raise money that was to be paid to the State for use of the State in establishing an agricultural experiment station within the county wholly-owned and controlled by the State. It was held that it violated Sec 2 of Article XII of the Constitution, requiring taxation to be according to a uniform rule according to value. In the case at bar, there is no such question. It does not involve the levy of a tax. True, Hoover Pavilion was acquired as in most public property, by the use of the taxing power, but the taxing transaction does not continue until the proceeds of the tax can no longer be traced. The proceeds of a tax levy lose their identity when expended. Sec. 2 of Article XII of the Constitution relates only to the levy and collection of taxes and imposes the rule of uniformity when the levy is according to value. The authority of municipalities and other political subdivisions over public property and the ultimate control of the state are foreign to the subject-matter and are governed by other constitutional and statutory provisions.

The only difference between Wasson v Comm'rs, supra, and Hubbard v Fitzsimmons, 57 Oh St 436, is that the legal title to the property was to be lodged in the county. The statute was applicable only to Cuyahoga County and, therefore, apparently violated sec. 26 of Article II of the Ohio Constitution, requiring all laws of a general nature to have a uniform operation throughout the State. It assumed to authorize Cuyahoga County to levy a tax for the specific purpose of furnishing an armory for the use of the state militia. The defect inhered in the legislation authorizing the tax as it did in Wasson v Comm'rs, supra.

We do not regard the case of State, ex rel. v Turner, 93 Oh St 379, as of any great aid. However, the cooperative ar-

rangement between Akron and the State was sustained, and the Court at pages 388 and 389, did point out that there was consideration accruing to Akron. No one suggested any duty to submit the transfer of the title to competitive bidding as a prerequisite.

In City of **Cleveland v Public Library Board, 94 Oh St 311,** the Court while approving the specific transfer, laid down the proposition that a municipal corporation had no authority to donate real estate to the trustees of a public library of a school district. Of course, legislative authority to make such a transfer would be necessary, and there was none. As we view it, it is one thing for one political subdivision to transfer to another subdivision and an entirely different thing for the sovereign state, acting under the authority of its legislative branch, to accept a transfer from one of its arms or instrumentalities as political subdivisions are: Furthermore, that case involved a donation, which is not the case at bar.

When the City of Cleveland established Hoover Pavilion for the care of the mentally ill, it must be taken to have known that it was engaging in an exercise of that kind of police power that was of state-wide concern, and, that therefore, was subject to the regulatory power of the state, exercised through general laws; that the mode and manner of its exercise by the City of Cleveland could be determined by the state or the function taken over entirely and exclusively by the state. The power of the State was not limited by the fact that the municipality had clearly entered the field. It had full power over the subject unhampered by any prior municipal or state legislation and limited only by constitutional provisions.

Our conclusion is, that under §1890-16, et seq GC, the Department of Public Welfare of the state had full power to bargain with the City of Cleveland for the use and operation of Hoover Pavilion, that the contract contemplated will be a cooperative arrangement, based upon valuable considerations flowing to the City of Cleveland, as well as to the State of Ohio, fully authorized by §1890-16 GC.

For these reasons, the judgment is affirmed.

HILDEBRANT, P. J., MATTHEWS & ROSS, J. J., concur in syllabus, opinion & judgment.